**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON**

**CIVIL ACTION NO. 13-83-DLB-JGW**

**TREVED EXTERIORS, INC.,**                                                 **PLAINTIFF**
**d/b/a TREVED EXTERIORS PLUS**


vs.                  **MEMORANDUM OPINION AND ORDER**


**LAKEVIEW CONSTRUCTION, INC., et al.**                     **DEFENDANTS**

*********************

Lakeview Construction, Inc. and Travelers Insurance and Casualty Company move to dismiss this case for failure to state a claim upon which relief can be granted, arguing that the Court should compel the parties to arbitrate this dispute because it falls well within the scope of the agreed upon arbitration provision. The Court has diversity jurisdiction over this removed action pursuant to 28 U.S.C. § 1332, 28 U.S.C. § 1441(b) and 28 U.S.C. § 1446(b).

**I.**     **Factual and Procedural Background**

Defendant Lakeview Construction, Inc. is the general contractor for the Crestview Hills Town Center development project in Crestview Hills, Kentucky. (Doc. # 1-1 at 18–21). In July 2012, Lakeview awarded Treved Exteriors Plus two subcontracts relating to the Crestview Hills development project. (*Id.*). Upon award, Lakeview project manager Janelle Vera mailed and faxed the Lakeview Subcontractor Packet to Treved. (Doc. # 9-1 at 1–2). This Packet contained the following documents: (1) purchase orders/subcontracts; (2) two

1

page terms and general conditions; (3) change order agreement; (4) insurance and worker's compensation requirements; (5) W-9 form; and (6) labor and material supplier disclosure form. (*Id.*).

The first subcontract provided that Treved would furnish and install all framing, drywall, taping, blocking, sheeting, panels and fixtures for the Altar'D State retail space at a contract price of $139,348.00. (Doc. # 1-1 at 18–19). Once Treved submitted a current certificate of insurance, W-9, signed purchase order, change order agreement and list of major suppliers, Lakeview would pay Treved $62,706.60, or 45% of the contract price. (*Id.* at 19). The next payment, also amounting to 45% of the contract price, would be due when Treved submitted labor, material and equipment rental lien waivers covering the first draw, a joint check agreement or a subcontractor affidavit. (*Id.*). Lakeview also asked Treved to provide a certified air balance report from the HVAC contractors at this juncture. (*Id.*). Treved would receive $13,934.80, the final 10% of the contract price, once it provided Lakeview with final labor, material and equipment rental lien waivers and a warranty statement. (*Id.*).

The second subcontract pertained to the furnishing and installation of exterior work, per provided plans and specifications, for the same retail space. (*Id.* at 20–21). Much like the first subcontract, this smaller subcontract provided that Lakeview would pay the contract price, totaling $28,328.00, in three installments. (*Id.*). Treved would receive $12,747.60, or 45% of the contract price, upon submitting the documents included in the Lakeview Subcontractor Packet. (*Id.*). Lakeview would pay the next 45% of the contract price upon receiving labor, material and equipment rental lien waivers and a certified air balance report. (*Id.*). The final 10% of the contract price, amounting to $2,832.80, would

2

be paid as soon as Treved provided final labor, material and equipment rental lien waivers and a warranty statement. (*Id.*).

Both purchase orders/subcontracts explicitly state that "your purchase order will have 4 pages (including the terms and conditions)." (*Id.* at 18, 21). The following statement is also printed, in bold face type, between the invoice procedures and the insurance requirements: "Please see the attached purchase order/subcontract terms and conditions." (*Id.*). Treved President Eddie Oblinger signed the appropriate blank at the bottom of each subcontract, signifying that the terms had been accepted by subcontractor. (*Id.*).

Paragraph thirteen of the attached terms and conditions included the following arbitration clause:

> Any controversy or claim arising out of or in relation to this purchase order/subcontract or its interpretation, construction or any breach thereof, or any relationship between the parties hereto, whether such claim is grounded in common law or statutory law, but excluding any claim seeking injunctive relief, shall be settled exclusively by arbitration in the state of Wisconsin, in accordance with the then-applicable construction industry arbitration rules of the American Arbitration Association and judgment rendered upon the award may be entered by any court of competent jurisdiction.

(Doc. # 7-1 at 4).

Around the same time that the subcontracts were signed and submitted, Lakeview received requests for work modifications from Walters and Mason Retail Inc., doing business as Altar'D State. (Doc. # 1-1 at 33–34). Lakeview communicated these instructions to Treved and work proceeded accordingly. (*Id.*). A Credit Memo, dated August 10, 2012, indicates that Lakeview received a $3,880 credit due to these modifications. (*Id.* at 28). On August 22, 2012, Treved received a check for $62, 706.60,

followed two weeks later by another check for $12,747.60. (*Id.* at 22–23). However, the record indicates that Treved did not receive payment for the balance of each contract price. Treved also incurred costs related to the work modifications, as reflected in four invoices dating from July to September 2012. (*Id.* at 29–32). These costs were properly documented and submitted to Lakeview in Change Order Application for Payment forms, dated October 8, 2012 and October 18, 2012, but it appears that Treved received no compensation for those expenses either. (*Id.* at 35–42).

On September 14, 2012, Treved ceased to furnish labor, materials and improvements for the retail space. (*Id.* at 7). Treved notified Crestview Hills Town Center, LLC of its intent to file a lien approximately one month later. (*Id.*). In December 2012, Treved filed a mechanics' and materialmen's lien on the property with the Kenton County Clerk's office, in an apparent effort to secure his right to payment in the amount of $94,458.80. (*Id.* at 7–9). The amount secured by the lien represents the unpaid balance on both contracts plus costs incurred for work modifications, minus Lakeview's credit. (*Id.*). Lakeview Construction bonded off this lien to Travelers Casualty and Surety Company of America, thereby clearing title to Crestview Hills Town Center and protecting the property owner. (*Id.* at 43). The Discharge of Lien Bond indicates that Travelers is bound to pay Treved, as obligee, the sum of $188,917.60, which is twice the amount secured by the mechanics' and materialmen's lien. (*Id.*).

On April 16, 2013, Treved filed suit against Lakeview Construction and Travelers, claiming breach of contract, unjust enrichment, misrepresentation and fraud. (*Id.* at 3–6). Lakeview and Travelers then removed the action to this Court on the basis of diversity jurisdiction and filed the pending Motion to Dismiss. (Docs. # 1 and 7).

4

**II.     Analysis**

**1.     Standard of Review**

Although often styled as a Rule 12(b)(6) Motion, a motion to dismiss based on the existence of a valid arbitration agreement is not evaluated under the usual *Twombly-Iqbal* standard. *Arnold v. Rent-A-Center*, Civ. A. No. 11-18-JBC, 2011 WL 1810145 at *2 (E.D. Ky. May 12, 2011) (surveying cases from other circuits); *Bruszewski v. Motley Rice, LLC*, Civ. A. No. 5:12-cv-46-JMH, 2012 WL 6691643 at *3 (E.D. Ky. Dec. 21, 2012); *Raasch v. NCR Corp.*, 254 F. Supp. 2d 847, 851 (S.D. Ohio Jan. 22, 2003) (noting that the defendant's Motion to Dismiss and Compel Arbitration "is not a motion which comes within the ambit of Rule 12(b) of the Federal Rules of Civil Procedure"). Instead, courts apply the standard applicable to motions for summary judgment. *Id.* To survive such a motion, the non-moving party must demonstrate that the validity of the agreement is "in issue" by showing that there is a genuine issue of material fact as to the validity of the arbitration agreement.[1] *Great Earth Co., Inc. v. Simons*, 288 F.3d 878, 888–89 (6th Cir 2002). If the non-moving party satisfies this burden, the court must allow the case to proceed to trial. *Id.* If the non-moving party fails to make the required showing, the court should compel arbitration. Id.

**2.     Interplay of the FAA and State Contract Law**

The Federal Arbitration Act provides as follows:

---

[1] The *Great Earth* case used the summary judgment standard to evaluate a motion to compel arbitration under a contract. *Arnold* and *Bruszewski* applied the same standard to motions to dismiss or stay based on the existence of a valid arbitration agreement, presumably because a district court's decision to compel arbitration means that the case must be either stayed or dismissed.

> A written provision in any maritime transaction *or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction*, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (2006) (emphasis added). This provision "embodies a national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing v. Cardegna*, 546 U.S. 440, 443 (2006). Courts must use federal case law to determine whether the FAA is applicable to a contract. *Seawright v. American General Financial Servs.*, 507 F.3d 967, 972 (6th Cir. 2007). If applicable, the FAA preempts state laws governing arbitration provisions. *Great Earth Companies, Inc. v. Simon*, 288 F.3d 878, 889 (6th Cir. 2002). It does not displace state law governing contract formation or contract defenses. *Id.* "Because arbitration agreements are fundamentally contracts, [courts should] review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright*, 507 F.3d at 972.

In this case, Defendant predicates its argument on the FAA, while Plaintiff relies chiefly on Kentucky contract law. At first blush one might assume that either Plaintiff or Defendant cited to inapplicable law, but their respective choices can be reconciled when one considers the interplay between the FAA and state contract law. Plaintiff maintains that it cannot be compelled to arbitrate because it did not agree to the arbitration provision. This argument essentially attacks the enforceability of the arbitration provision, an issue that is still governed by state contract law. By contrast, Defendant maintains that the provision is enforceable and, because the contract implicates interstate commerce, the FAA is applicable. Defendant then argues that the parties intended to arbitrate the dispute at

6

issue, so the Court should compel them to do so. Defendant focuses on the scope of the arbitration provision, which is covered by the FAA. Because the Court cannot consider whether the parties intended to arbitrate the dispute at issue without first determining whether there is an enforceable arbitration provision, the Court will consider the merits of Plaintiff's argument first.

### 3. Enforceability of the Subcontracts

Under Kentucky law, a writing "shall not be deemed to be signed unless the signature is subscribed at the end or close of the writing." *Consolidated Aluminum Corp. v. Krieger*, 710 S.W.2d 869, 873 (Ky. App. April 25, 1986)(citing Ky. Rev. Stat. Ann. § 446.060(1)). Because the UCC supplements Kentucky law, rather than displacing it, any part of a commercial writing appearing below the signature line does not become part of the contract. *Id.* However, this general rule does not do away with the doctrine of incorporation by reference. *Id.* It simply requires that "any incorporating language [ ] appear above the signature line of the contract in order to be valid and enforceable in the courts." *Id.*

Plaintiff argues that it did not sign any contract containing an arbitration provision, nor did it sign the two-page terms and conditions. Because Kentucky's subscription rule provides that only those terms appearing above the signature line become part of the contract, Plaintiff believes that it did not agree to participate in arbitration. Plaintiff further insinuates that it never received the "two pages of unreadable fine print" attached to Defendant's Motion because Plaintiff does not have a copy in its file.

Although the two subcontracts do not specifically mention the arbitration provision above the signature line, they do contain appropriate incorporating language. The

7

subcontracts repeatedly direct the reader's attention to the attached terms and conditions. As Kentucky law makes clear, the subscription rule in no way abolishes the incorporation by reference doctrine. It simply requires that the incorporating language appear above Plaintiff's signature, as it does in this instance. Because Plaintiff signed the subcontracts below the incorporating language, the attached terms and conditions became part of the contract. Therefore, the arbitration clause is enforceable.

Plaintiff suggests that the attached terms and conditions are not binding because they are not in Plaintiff's records, but this argument does not dispose of the issue before the Court. Even if Plaintiff did not receive the terms and conditions along with the subcontracts, the incorporating language should have alerted Plaintiff to this error. Ignorance of the terms of the contract does not relieve Plaintiff from its obligation. *See Wehr Constructors, Inc. v. Assurance Co. Of Am.*, 384 S.W.3d 680, 685 (Ky. 2012). "[A]bsent fraud in the inducement, a written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms." *Id.* (*quoting Conseco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. App. 2001)

Having found that the arbitration agreement is enforceable, the Court must now consider whether the current dispute falls within the scope of the arbitration provision.

  **4.  Intent to Arbitrate**

The Federal Arbitration Act applies only to "[a] written provision in any maritime transaction or *a contract evidencing a transaction involving commerce*." 9 U.S.C. § 2 (emphasis added). In *Allied Bruce-Terminix Companies, Inc. v. Dobson*, the United States Supreme Court had occasion to interpret the phrase "evidencing a transaction involving commerce." 513 U.S. 265 (1995). First, the Court concluded that the word 'involving' was

8

the functional equivalent of 'affecting.' *Id.* at 273–74. Because the words 'involving commerce' are broader than the term of art 'in commerce,' the Court decided that 'involving commerce' "cover[s] more than only persons or activities within the flow of interstate commerce." *Id.* at 273. Second, the Court adopted a 'transaction in fact' interpretation of the phrase 'evidencing a transaction.' *Id.* at 277–78. The Court "read[] the Act's language as insisting that the 'transaction' in fact 'involve' interstate commerce, even if the parties did not contemplate an interstate commerce connection."[2] *Id.* at 281.

When a party invokes the FAA and asks a federal court to dismiss or stay a case and compel arbitration, the court must determine whether the parties agreed to arbitrate the dispute at issue. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). This requires an examination of the contract language in light of the strong federal policy favoring arbitration, resolving any ambiguities in the contract or doubts as to the parties' intentions in favor of arbitration. *Id.* Courts should engage in the following four-step inquiry: (1) determine whether the parties agreed to arbitrate; (2) determine the scope of that agreement; (3) if federal statutory claims are asserted, the court must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that

---

[2] In this case, homeowners in Birmingham, Alabama purchased a lifetime "Termite Protection Plan" from Allied-Bruce Terminix Companies, a local franchise of Terminix International Company. Under the terms of the Plan, Allied-Bruce would protect the house from termites, inspect periodically and provide any necessary treatment or repairs. Allied-Bruce inspected the house shortly before the homeowners sold it, but the purchasers of the property discovered a termite infestation soon after. The purchasers sued the homeowners, who in turn sued Allied-Bruce and Terminix International. Although this point was not actually disputed by the parties, the Court's opinion seemed to confirm that the contract evidenced a transaction involving interstate commerce, such that the FAA applied. The Court noted that "[i]n addition to the multistate nature of Terminix and Allied-Bruce, the termite-treating and house-repairing material used by Allied-Bruce in its (allegedly inadequate) efforts to carry out the terms of the Plan, came from outside Alabama." *Id.* at 281.

some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration. *Id.*

As a threshold matter, the Court notes that Defendant's invocation of the FAA is appropriate under the circumstances. As the summons indicates, Defendant Lakeview Construction has its principal place of business in Pleasant Prairie, Wisconsin. (Doc. # 1-1 at 1–2). Plaintiff's principal place of business is in Cincinnati, Ohio. (*Id.* at 3). In addition to conducting other business in Kentucky, both Plaintiff and Defendant agreed to work on the Crestview Hills development project. (*Id.* at 18–21). Pursuant to the subcontracts at issue in this case, an Ohio entity provided services for a Wisconsin entity at a construction site in Kentucky. Because there has been a transaction that, in fact, affected interstate commerce, the FAA is applicable to the arbitration provisions of the subcontracts.

Relying on the FAA, Defendant argues that this case should be dismissed and the parties should be compelled to arbitrate because the terms and conditions of the subcontract require them to arbitrate all claims or controversies arising out of this business relationship, except those claims seeking injunctive relief. (Doc. # 7-1 at 4). In fact, the provision specifically mentions that claims for breach of contract should be arbitrated. (*Id.*). Defendant believes that this evinces the parties' clear intent to arbitrate the claims at issue in this case, which include breach of contract, unjust enrichment, misrepresentation and fraud. Plaintiff does not request any injunctive relief. Therefore, Defendant believes that this case falls squarely under the arbitration provision.

First, it must be noted that the parties did agree to arbitrate. The attached terms and conditions provide that the parties will arbitrate "[a]ny controversy or claim arising out of or in relation to this purchase order/subcontract or its interpretation, construction or any

breach thereof, or any relationship between the parties hereto, whether such claim is grounded in common law or statutory law." (*Id.*). Second, the language of the arbitration provision is very broad, only "excluding any claim seeking injunctive relief." (*Id.*). Because Plaintiff brings this action to obtain payment from Defendant for services rendered pursuant to the purchase orders/subcontracts, the breach of contracts and unjust enrichment claims clearly arise out of the subcontracts/purchase orders. Additionally, Plaintiff's fraud and misrepresentation claims arise out of the relationship of the parties to the subcontracts/purchase orders. All of these claims fall under the broad language of the arbitration provision. If the expansive reach of this language is not proof enough of the parties' intent, it is noteworthy that the parties only named one exception to the general agreement to arbitrate. This exception, which allows the parties to sue for injunctive relief, is a very narrow and specific form of redress, and one that Plaintiff does not seek in this case. Therefore, the Court finds that the scope of the arbitration agreement covers this dispute. Because this case involves only state law contract claims, the Court need not consider the third and fourth prongs of the analysis.

In light of the above analysis, Plaintiff has not demonstrated that there is a genuine issue of material fact as to the validity of the agreement to arbitrate. As a matter of state law, the arbitration provision was properly incorporated into the subcontracts be reference along with other general terms and conditions. Under the FAA, the language of the arbitration provision is clear that the parties intended to arbitrate the dispute at issue. Certainly, Plaintiff believes that the agreement itself is in issue. Without such a genuine issue of material fact, the Court cannot allow this action to proceed. Therefore, the Court must grant Defendant's Motion to Dismiss and compel the parties to arbitrate this dispute.

### III. Conclusion

For the reasons stated above, **IT IS ORDERED** as follows:

1. Defendant's Motion to Dismiss and Compel Arbitration (Doc. # 7) be, and is, hereby **granted**. This matter shall be stricken from the Court's active docket.

2. The parties shall proceed to arbitration in accordance with the terms of their arbitration agreement.

This 18th day of March, 2014.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\Opinions\Covington\2013\13-83 MOO granting MTD and Mtn to Compel Arbitration.wpd